1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    MELVIN R. PLAINTIFF,                      No. 1:20-cv-01253-KES-SAB (PC)

12                    Plaintiff,                 FINDINGS AND RECOMMENDATIONS
                                                 REGARDING DEFENDANTS' MOTION
13           v.                                  FOR SUMMARY JUDGMENT

14    KELLY SANTORO, et al.,                     (ECF No. 81)

15                    Defendants.

16

17           Plaintiff is proceeding pro se and in forma pauperis in this civil rights action filed pursuant

18    to 42 U.S.C. § 1983.

19           Currently before the Court is Defendants' motion for summary judgment, filed January

20    10, 2024.  (ECF No. 81.)

21                                              **I.**

22                                **PROCEDURAL BACKGROUND**

23           This action is proceeding Defendants Dodson, Garcia, and Tapia for retaliation, and

24    separate excessive force claims against Defendants J. Florez and Tapia.

25           Defendants filed an answer to the complaint on July 1, 2021.

26           The Court issued the discovery and scheduling order on September 17, 2021.

27           On December 17, 2021, Defendants filed a motion for summary judgment on the ground

28

                                                  1

of failure to exhaust the administrative remedies.[1]  Plaintiff filed an opposition on February 22, 2022, and Defendants filed a reply on March 4, 2022.

On October 5, 2022, Defendants' exhaustion motion for summary judgment was granted in part and denied in part.  (ECF No. 56.)  More specifically, Defendants motion was granted as to the retaliation claims against Defendants Lozano, Valdez, Felix, A. Flores, and Chanelo, and denied as to the retaliation claims against Defendants Dodson and Garcia.  (Id.)

As previously stated, on January 10, 2024, Defendants filed the instant motion for summary judgment on the merits of Plaintiff's remaining claims.  (ECF No. 81.)  Plaintiff filed an opposition on April 5, 2024, and Defendants filed a reply on May 3, 2024.  (ECF Nos. 90, 93.)

## II.

## LEGAL STANDARD

### A.    Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509

---

[1] Defendants J. Florez and D. Tapia did not move for summary judgment for failure to exhaust the administrative remedies.

F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

**A.      Summary of Plaintiff's Complaint**

In March 2018, while at NKSP Plaintiff was in route to A-yard dining hall for the evening meal.  As the Plaintiff was entering the dining hall, the entrance was blocked by an unidentified inmate who was surrounded by six or seven program officers.  The officers were inciting the inmate.  The inmate was an elderly African American who needed the assistance of a walking cane.  As the Plaintiff proceeded to enter the dining hall, he asked the elderly inmate if he was okay, and officer Dodson told Plaintiff to keep walking.  Plaintiff complied with the order.  Officer Dodson immediately began conversing with officer E. Garcia about the Plaintiff.  Once Plaintiff was exiting the dining hall, officer Garcia stated, "are you Plaintiff" while shaking his head "up and down" with an unpleasant smirk in an attempt to incite Plaintiff.  Prior to this incident, Plaintiff spoke with lieutenant A. Flores about building B officers not giving inmates a courtesy unlock to use the restroom because the building dayroom did not have a toilet.  Lieutenant Flores responded, "you think you can come and change things around here."  Flores also stated, "you can live here peacefully, or have a target on your back."  Plaintiff filed an inmate grievance regarding Flores's conduct.  After Plaintiff filed the grievance, officers that worked on

1  the A-yard program began "mean mugging" Plaintiff calling him a "snitch" and using intimating

2  language toward Plaintiff adding "snitches get stitches."  When Plaintiff would go to yard,

3  medical, or dining hall and program office, officers around would make comments while

4  "pointing" at Plaintiff.

5       On May 29, 2018, Plaintiff would experience the "first" retaliatory event promised by

6  lieutenant A. Flores.  As Plaintiff was exiting his building for evening yard, "A" yard tower told

7  "all" of the inmates to move to the "center" of the yard for "escorted movement."  Approximately

8  two hundred inmates were moving to the center of the yard when the prisoner alarm sounded.

9  The yard tower officer told all inmates to "get down."  Plaintiff complied as did the majority of

10  inmates.  Officers Garcia, Dodson, lieutenant Flores and other unidentified officers started cuffing

11  and escorting inmates to "A" yard gym, and placed them in cages.  All the escorted inmates were

12  ordered to remove their clothing so a nurse could examine their bodies.  Plaintiff was later

13  released from the gym cages and told to go see lieutenant Flores in the program office to sign a

14  chrono.  This process was "odd" to Plaintiff because he "was not" a participant in the cause of the

15  alarm activation.  Plaintiff attempted to read the chrono but the font was too small and he could

16  not read it without his prescription glasses.  When Plaintiff asked officer Garcia for his reading

17  glasses, Garcia became volatile and snatched the paper chrono out of Plaintiff's hand and said,

18  "I'm putting your black ass back in the cage."  While Plaintiff was being escorted back to the

19  gym cage, lieutenant Flores told Plaintiff, "if you don't sign the chrono," I'm going to place you

20  in "Ad-Seg" for safety concerns.

21       Plaintiff told Flores that he was attempting to falsify state documents.  "A" yard program

22  officers surrounded Plaintiff in an inciting manner challenging him to a fight.  In addition,

23  officers Garcia and Dodson searched Plaintiff's cell destroying his personal property and federal

24  court documents the Plaintiff was working on in an ongoing civil case.  Plaintiff filed an inmate

25  grievance regarding the property destruction.

26       On June 8, 2018, Plaintiff was served a false Rules Violation Report (RVR) Log No.

27  5092331  in retaliation for Plaintiff filing a staff complaint on May 30, 2018, appeal number

28  NKSP-A-18-2054.  The false RVR was dismissed in the interest of justice because the charges

could not be substantiated.

In response, "A" yard program officers generated another false RVR against Plaintiff. This RVR accused Plaintiff of having contraband in his cell-a cellular device.

On July 23, 2018, officer Garcia indicated he was writing his report in "lieu" of officer Maldonado because Maldonado was unable to enter the prison's computer system.

On July 31, 2018, officer Garcia generated RVR Log No. 5343660 as the "reporting employee" giving a detailed report.

On August 31, 2018, lieutenant Smith who was not a regular Senior Hearing Officer (SHO) on "A" yard effortlessly sensed the "fishiness" of the RVR No. 5343660 and dismissed it in the interest of justice.

Plaintiff filed another inmate grievance appeal number NKSP-A-18-4014 against officer Garcia for retaliation and falsification of state documents to punish Plaintiff for exercising his constitutional right to file a grievance.

On August 7, 2018, Plaintiff a Form-22 request to building officer A. Terronez regarding officer Garcia's issuance the second RVR. Terronez responded stating that Plaintiff was in need of a cell search receipt from the officer who searched his cell because contraband was found.

Plaintiff filed another grievance appeal number NKSP-A-18-2588 regarding the false RVR being issued without penal interest.

At all pertinent times, Plaintiff was a Correctional Clinical Case Management System (CCCMS) participant diagnosed with a "depressive" disorder and suffers from anxiety.

On October 17, 2018, Plaintiff consulted correctional counselor A. Padilla about the incidents that took place against him and asked for a transfer to another institution because he feared for his safety at NKSP. Counselor Padilla agreed to transfer Plaintiff. On this same date, a hearing was held on the transfer and Plaintiff conveyed to the committee that he was constantly harassed by NKSP custody staff. Captain Chanelo denied Plaintiff's transfer leaving him in harm. Counselor Padilla and captain Chanelo did not investigate Plaintiff's concerns. Plaintiff promptly filed a grievance appeal number NKSP-A-18-4420, in which Plaintiff mentioned he was being harassed and retaliated against by having to strip naked in front of the opposite sex and his

5

1    contentions were not investigated.  Plaintiff's contentions were not investigated.

2    On December 12, 2018, officer Herrera retaliated against Plaintiff by issuing a false RVR

3    counseling chrono accusing Plaintiff of disobeying an order.

4    On December 19, 2018, Plaintiff sent officer Herrera a Form 22 request indicating that he

5    was in front of building 1 which is on the opposition side of building 5.  Plaintiff also indicated

6    that he has a medical ailment in his leg in which hardware was inserted due to a compound

7    fracture.  When the season changes to a cold climate Plaintiff experiences discomfort if he moves

8    too fast.

9    On December 12, 2018, Plaintiff filed a Form 22 request regarding officer Ortega's

10    regarding Ortega's action in closing the door after yard recall.  Ortega responded stating, "I did

11    what I was instructed to do, close the front door, not knowing who was outside."

12    Officer Herrera never answered Plaintiff's Form 22 request.  Plaintiff also asked inmate

13    Rutherford if he received an RVR and he said he "did not."

14    On January 14, 2019, Plaintiff was issued another falsified RVR in retaliation for

15    reporting the officers misconduct.  Plaintiff was charged with possession of dangerous

16    contraband, a state issued shaving razor.  Officer D. Ceballos searched Plaintiff's cell and

17    removed a "state issued" shaving razor which was in plain view in Plaintiff's cell locker.

18    Ceballos provided Plaintiff with a cell search receipt and classified the razor as a "weapon."

19    Officers Luna and Ornelas told lieutenant Flores that the razor was not a weapon or

20    dangerous contraband.  However, lieutenant Flores found Plaintiff guilty of the RVR.  Plaintiff

21    filed a grievance appeal number NKSP-A-19-0445 against Flores and captain Chanelo for

22    ordering officer Ceballos to leave his assigned post to harass Plaintiff by issuing a false RVR in

23    retaliation for exercising his rights to file a grievance.

24    On May 18, 2019, Plaintiff's cell was searched again by officer Valdez for over thirty

25    minutes.  When Plaintiff entered his cell after the search, it appeared that "nothing" had been

26    touched or searched.  Valdez left Plaintiff's cell and walked to the building 5 office.  Shortly

27    after, Valdez went back to Plaintiff's cell and said he found "contraband" in Plaintiff's cell,

28    namely, a cellular device.  Valdez issued Plaintiff two separate false RVRs for the same violation

in retaliation for filing prior grievances.  The RVR for the cellular device was dismissed.  Plaintiff filed grievance appeal number NKSP-X-19-03401, and once again Plaintiff's right to appeal was impeded with "no" real reason why.

On May 18, 2019, Plaintiff made contact with officer Baez and expressed that his safety was in danger by "A" yard staff and he was the subject of constant harassment.  Shortly thereafter, sergeant Dement and five other "A" yard officers cuffed Plaintiff and escorted him to the "A" yard gym cages for administrative segregation pending investigation of his safety concerns.  After waiting in the cage, a registered nurse presented a 7219 incident report package and ordered Plaintiff to strip down for a body examination for administrative segregation placement.  After waiting in the cage for several more hours, Plaintiff saw all his personal property in boxes wheeled in front of him.  Then, officers Felix and Florez appeared at Plaintiff's cage and said, "special orders from captain Chanelo you are going back to five block."  Plaintiff followed officer Florez's order to cuff up.  When Plaintiff placed his hands through the cage slot to be cuffed, Florez squeezed Plaintiff's fingers together on his right hand and slammed the Plaintiff's hand against the cage slot.  Plaintiff felt the bone in his right hand "pop."  As Plaintiff was being escorted back to building 5, officer Florez pinned Plaintiff's arm up like a wrestler.  Plaintiff asked Florez why he was so rough with his escort even though Plaintiff complied with all orders.  Florez did not respond and continued with the unnecessary use of force.

As Plaintiff and the five to six officers reached building 5, Plaintiff expressed suicidal ideations so he could be separated from "A" yard staff.  Plaintiff was taken off of "A" yard and taken to the hospital.  Plaintiff filed another grievance appeal number NKSP-19-01927 regarding Florez's unnecessary use of force.  Plaintiff made contact with Ibrerra who asked to see Plaintiff's identification card.  Once Ibrerra saw Plaintiff's name he stated, "O-yeah I remember you."  He then told Plaintiff to sit tight, and Plaintiff complied.  Ibrerra made a phone call and a few minutes later about nine to twelve officers went into the building.  Tapia told Plaintiff "are you fucking stupid"  and ordered him to stand up.  Tapia snatched some legal documents Plaintiff had in his hand and threw them on the floor.  Tapia then escorted Plaintiff outside the building and once outside he pushed and threw Plaintiff against the wall.  Plaintiff felt his knee "pop."  Tapia

then slammed Plaintiff to the ground and told him "fuck your rights and the Judge."  Tapia then stated, "you wanna make video complaints against my partner," and kicked Plaintiff twice in the chest.  Thereafter, Tapia dragged Plaintiff back up to his feet while he was cuffed behind his back and escorted him to the gym cages.  Once Plaintiff was back inside the gym, Tapia challenged Plaintiff to a fight.  While in the cages, officers Mendez and Robinson conducted a 7219 incident report, and as Robinson examined Plaintiff's body she stated, "Oh God" when she saw his injuries.  After Robinson left, officer Mendez said, "snitching ain't gone get you nowhere."  Plaintiff then requested to see a lieutenant so he could report the second incident of unnecessary use of force.  Lieutenant Knight video recorded the Plaintiff on May 24, 2019, and started another investigation.

Plaintiff went back to the hospital and Doctor Girouard noticed new injuries and instructed Plaintiff to draft a "keep away" request on a Form 22 and he would personally deliver it to captain Chanelo.  On May 29, 2019, Plaintiff drafted the Form 22 and delivered it directly to captain Chanelo who denied the request even after Plaintiff was subjected to unnecessary use of force.

### B.    Statement of Undisputed Facts[2],[3]

1.    Plaintiff Melvin Plaintiff, who is proceeding pro se, is a former inmate with the California Department of Corrections and Rehabilitation (CDCR).  (ECF No. 1; ECF No. 51.)

2.    Between May 2018 and May 2019 and prior to his release from incarceration, Plaintiff was an inmate at North Kern State Prison (NKSP).  (ECF No. 1 at 1.)

3.    In May 2018 and July 2018, Defendant-Officers Dodson and Garcia were working at NKSP as a correctional officers.  (Declaration of Garcia (Garcia Decl.) ¶ 2; Declaration of Dodson (Dodson Decl.) ¶ 2.)

---

[2] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by defendant as undisputed.  Local Rule 56-260(b).  Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint and opposition.  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

[3] Hereinafter referred to as "UF."

4.        In May 2019, Defendant-Officer Florez and Defendant-Sergeant Tapia were working at NKSP as correctional officers.  (Declaration of Florez (Florez Decl.) ¶ 2; Declaration of Tapia (Tapia Decl.) ¶ 1.)

5.        Plaintiff proceeds on a First Amendment retaliation claim against Officers Dodson and Garcia arising from a May 29, 2018 entry into Plaintiff's cell.  (ECF No. 1 at 21-22; ECF No. 11 at 11.)

6.        Plaintiff proceeds on a First Amendment retaliation claim against Officer Garcia relating to a RVR Officer Garcia submitted on July 23, 2018.  (ECF No. 1 at 12-13; ECF No. 11 at 11.)

7.        Plaintiff proceeds on an Eighth Amendment excessive force claim against Officer Florez alleging that, on May 18, 2019, Officer Florez used excessive force when restraining and escorting Plaintiff.  (ECF No. 1 at 21-22; ECF No. 11 at 11.)

8.        Plaintiff proceeds on Eighth Amendment excessive force and First Amendment retaliation claims associated with Sergeant Tapia's May 24, 2019 escort of Plaintiff.  (ECF No. 1 at 23-24; ECF No. 11 at 11; ECF No. 13.)

9.        The remainder of Plaintiff's claims were dismissed when the Court screened Plaintiff's complaint and when the Court partially granted Defendants' exhaustion-based motion for summary judgment.  (ECF Nos. 1, 11, 52, 56.)

10.      In the evening on May 29, 2018, an inmate fight triggered an alarm announced via institutional radio requesting correctional officers respond to the Facility A Exercise Yard. (Garcia Decl. ¶ 3; Dodson Decl. ¶ 3.)

11.      Officer Garcia responded to the location of the fight.  (Garcia Decl. ¶ 3.)

12.      Plaintiff was restrained in handcuffs.  (Garcia Decl. ¶ 3.)

13.      In response to the fight, Officer Dodson arrived on the yard while other officers were in the process of escorting the involved inmates towards the Facility A Gym.  (Dodson Decl. ¶ 4.)

14.      Plaintiff and other inmates were escorted to holding cells located in the gym, and Officers Garcia and Dodson also proceeded to the gym.  (Garcia Decl. ¶ 3; Dodson Decl. ¶ 4.)

15.     Plaintiff concedes identifying inmates based on their identification card is important.  (Declaration of Georgely (Georgely Decl.) ¶ 2 & Ex. A (Pl. Dep. at 31:19-32:1.)

16.     The inmates identified as participating in the fight were interviewed in the gym and then escorted into the adjoining Facility A Program Office.  (Garcia Decl. ¶ 4.)

17.     From the time he was detained after the fight to when he returned to his cell in Building 5, Plaintiff did not witness Officer Dodson, Officer Garcia, or any officer enter his cell. (Georgely Decl. ¶ 2 & Ex. A, at 73:18-23.)

18.     On July 3, 2018, in reply to the response in grievance log number NKSP-A-18-02588, Plaintiff wrote: "E. Dodson and E. Garcia searched my cell and destroyed my personal property on 5-29-2018 in retaliation of me being [i]nvolved in the alleged incident on 5-29-2018." (Decl. Appeals Coordinator Magallanes (Magallanes Decl.), ECF No. 46-5 at 92.)

19.     Inmate possession of cell phones poses a serious risk to the safety and security of NKSP.  (Declaration of Valdez (Valdez Decl.) ¶ 7.)

20.     Inmates at NKSP use cell phones for purposes that pose a safety and security threat, including to arrange for the physical injury of other inmates and prison employees, traffic drugs or other contraband, arrange for money transfers, manage criminal enterprises, and facilitate criminal communications with inmates and non-inmates.  (Valdez Decl. ¶ 7.)

21.     Because Sergeant Maldonado's shift ended at 2:00 p.m., he was unable to submit the rules violation report for Plaintiff's possession of a contraband cell phone.  (Garcia Decl. ¶ 6 & Ex. A; Declaration of Maldonado.[4] (Maldonado Decl.) ¶ 4.)

22.     Before the end of his shift, Sergeant Maldonado wrote the circumstances of the violation documenting Plaintiff's cell phone possession.  (Garcia Decl. ¶ 6; Maldonado Decl. ¶ 3.)

23.     Officer Garcia, who was working the next shift that began at 2:00 p.m. that day, submitted the report documenting Plaintiff's possession of a cell phone as instructed on Sergeant Maldonado's behalf.  (Garcia Decl. ¶ 7 & Ex. A; Maldonado Decl. ¶ 4.)

---

[4] Plaintiff attempts to dispute this fact by arguing that Defendant Garcia's reason for imputing the RVR has now changed because the RVR states that officer Maldonado was "unable to personally enter the report into SOMS." (ECF No. 90 at 18 & Ex. B.)  However, Defendant's statement of fact simply expands on the reason why Garcia entered the RVR into SOMS and is consistent, not contrary to, the statement reflected on the RVR.

24.     Having Officer Garcia submit the rules violation report on Sergeant Maldonado's behalf ensured the prompt reporting of the rules infraction.  (Garcia Decl. ¶ 7 & Ex. A; Maldonado Decl. ¶ 4.)

25.     In the "circumstances of violation" section, Officer Garcia indicated he was submitting the rules violation report on Sergeant Maldonado's behalf by writing: "I Officer E. Garcia am writing this report in lieu of Officer M. Maldonado due to him being unable to personally enter the report into SOMS."  (Garcia Decl. ¶ 7 & Ex. A.)

26.     On May 18, 2019, at around 10:35 a.m., non-party Officer Valdez conducted a random cell search of Plaintiff's cell in Building 5 and located a cell phone.  (Valdez Decl. ¶¶ 4–5 & Exs. A–B.)

27.     At approximately 12:00 p.m. on May 18, 2019, Plaintiff was placed in a holding cell located in the Facility A Gym for security reasons.  (Declaration of Felix (Felix Decl.) ¶ 4 & Ex. A.)

28.     Minutes after being placed in the holding cell at approximately 12:00 p.m. on May 18, 2019, non-party Licensed Vocational Nurse Robinson evaluated Plaintiff and concluded he did not have any injuries.  (Declaration of Robinson (Robinson Decl.) ¶ 5 & Ex. B.)

29.     At approximately 3:35 p.m., Defendant Florez was ordered to escort Plaintiff to Building 5.  (Felix Decl. ¶ 5 & Ex. A.)

30.     To prepare for the escort, Officer Florez instructed Plaintiff to put his hands behind his back and place his hands through the small handcuff port in the holding cell.  (Florez Decl. ¶ 3.)

31.     Non-party Sergeant Felix assisted with the escort by walking a few feet behind Plaintiff and Defendant Florez.  (Felix Decl. ¶ 5.)

32.     When Officer Florez, Sergeant Felix, and Plaintiff were more than halfway to Building 5, Plaintiff stated that he was suicidal.  (Florez Decl. ¶ 4.)

33.     Plaintiff admits this claim of being suicidal was not true.  (Georgely Decl. ¶ 2 & Ex. A (Pl. Dep. at 121:14-21.)

34.     In response to Plaintiff's claiming to be suicidal, Sergeant Felix instructed

11

Defendant Florez to escort Plaintiff back to the gym.  (Florez Decl. ¶ 4; Felix Decl. ¶ 6 & Ex. B.)

35.     At approximately 3:40 p.m., no more than five minutes after Plaintiff was ordered to be released to Building 5, Defendant Florez placed Plaintiff back in the same holding cell in the gym.  (Felix Decl. ¶ 7 & Ex. B; Florez Decl. ¶ 5.)

36.     Defendant Florez and Sergeant Felix prepared a new holding cell log to document Plaintiff's holding-cell placement.  (Florez Decl. ¶ 5; Felix Decl. ¶ 7 & Ex. B.)

37.     In accordance with policy after placing an inmate in a holding cell, Defendant Florez conducted an unclothed body search of Plaintiff.  (Florez Decl. ¶ 5.)

38.     During his unclothed body search of Plaintiff, Officer Florez did not see anything on Plaintiff's body to indicate Plaintiff had any injuries.  (Florez Decl. ¶ 5.)

39.     On May 18, 2019, Nurse Robinson concluded Plaintiff had no injuries.  (Robinson Decl. ¶ 6 & Exs. A–B.)

40.     Nurse Robinson documented on a CDCR Form 7219 Plaintiff's lack of injuries and Plaintiff's no comment as to whether he had any injuries.  (Robinson Decl. ¶ 6 & Ex. A.)

41.     When Nurse Robinson returned to the Facility A Medical Clinic, a few minutes after she examined Plaintiff, she entered a progress note into Plaintiff's health records memorializing her observations and conclusion that Plaintiff had no injuries.  (Robinson Decl. ¶ 6 & Ex. B.)

42.     That evening, Sergeant Felix authorized Plaintiff to be released from the holding cell to medical staff because he claimed to be suicidal.  (Felix Decl. ¶ 7 & Ex. B.)

43.     On May 21, 2019, x-rays were taken of Plaintiff's right hand, wrist, and shoulder.  (Declaration of Alphonso (Alphonso Decl.) ¶ 4 & Ex. A.)

44.     The May 21, 2019 x-rays did not identify any present or recent injury to Plaintiff's right wrist, hand, or shoulder.  (Alphonso Decl. ¶ 4 & Ex. A.)

45.     On May 24, 2019, at around 5:00 p.m., Defendant Tapia responded to Building 4 to escort Plaintiff to the Facility A Gym.  (Declaration of Tapia (Tapia Decl.) ¶ 3.)

46.     At that time, Defendant Tapia was assigned to and working a shift as a Facility A Security Patrol Officer.  (Tapia Decl. ¶ 3.)

47.     When Defendant Tapia responded to this escort, he knew Plaintiff had recently been reassigned to general population from the mental-health unit several times after Plaintiff had claimed he could not safely remain in general population.  (Tapia Decl. ¶ 3.)

48.     Between May 18, 2019 and May 24, 2019, Plaintiff was twice reassigned to general population in Facility A from the mental-health unit at NKSP.  (Tapia Decl. ¶ 2.)

49.     NKSP's Investigative Services Unit is tasked with investigating the veracity of inmate-reported safety concerns that could result in an inmate being assigned to a non-general population housing unit.  (Tapia Decl. ¶¶ 2–3.)

50.     The officers assigned to Building 4 informed Defendant Tapia that they needed assistance in escorting Plaintiff.  (Tapia Decl. ¶ 3.)

51.     The officers assigned to Building 4 informed Sergeant Tapia that Plaintiff told them that he was suicidal.  (Tapia Decl. ¶ 3.)

52.     Sergeant Tapia encountered Plaintiff in the dayroom of Building 4.  (Tapia Decl. ¶ 3.)

53.     Non-party Officer Hurley assisted with the escort.  Tapia Decl. ¶ 4; Declaration of Hurley (Hurley Decl.) ¶ 3.)

54.     At approximately 5:20 p.m. on May 24, 2019, Nurse Robinson examined Plaintiff in the holding cell.  (Robinson Decl. ¶ 7.)

55.     Nurse Robinson concluded that, besides an abrasion to his right knee, Plaintiff had no injuries.  (Robinson Decl. ¶ 7.)

56.     At approximately 8:35 p.m. on May 24, 2019, Nurse Robinson again examined Plaintiff in the holding cell.  (Robinson Decl. ¶ 7.)

57.     During her 8:35 p.m. examination, Nurse Robinson again observed the abrasion on Plaintiff's right knee.  (Robinson Decl. ¶ 7.)

58.     During her 8:35 p.m. examination, Nurse Robinson observed new injuries in the form of an abrasion to Plaintiff's right elbow and discoloration to Plaintiff's left wrist.  (Robinson Decl. ¶ 7.)

59.     Nurse Robinson concluded Plaintiff had no other injuries.  (Robinson Decl. ¶ 7.)

60.     In the morning on May 25, 2019, non-party Dr. Alphonso examined Plaintiff. (Alphonso Decl. ¶ 5.)

61.     During the May 25, 2019 encounter, Dr. Alphonso ordered x-rays of Plaintiff's right wrist and knee.  (Alphonso Decl. ¶ 5.)

62.     Dr. Alphonso documented that Plaintiff was uncooperative during his May 25, 2019 examination.  (Alphonso Decl. ¶ 5.)

63.     The only injury Dr. Alphonso saw during his May 25, 2019 examination of Plaintiff was an abrasion and bruise on Plaintiff's right knee.  (Alphonso Decl. ¶ 5.)

64.     On May 28, 2019, Plaintiff had his right wrist and knee x-rayed as ordered. (Alphonso Decl. ¶ 5 & Ex. B.)

65.     The May 28, 2019 x-ray of Plaintiff's right knee was compared with a September 2015 x-ray of Plaintiff's right knee.  (Alphonso Decl. ¶ 5 & Ex. B.)

66.     Based on comparison, there was no finding of any recent injury to Plaintiff's knee. (Alphonso Decl. ¶ 5 & Ex. B.)

67.     The May 28, 2019 x-ray of Plaintiff's right wrist was compared with the May 21, 2019 x-ray of Plaintiff's right wrist.  (Alphonso Decl. ¶ 5 & Ex. B.)

68.     Based on the comparison, there was no finding of any recent injury to Plaintiff's right wrist.  (Alphonso Decl. ¶ 5 & Ex. B.)

69.     Based on the x-rays of Plaintiff's right wrist and knee, Dr. Alphonso concluded that the status of Plaintiff's right wrist and knee were normal and unchanged from prior x-rays.

70.     After reviewing Plaintiff's May 28, 2019 x-rays, Dr. Alphonso prepared a patient letter to Plaintiff informing Plaintiff that his x-ray results were within normal limits or unchanged and that no follow up was needed.  (Alphonso Decl. ¶ 6 & Ex. C.)

## III.

## DISCUSSION

### A.     Retaliation

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012)

(citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  To state a cognizable retaliation claim, Plaintiff must establish a nexus between the retaliatory act and the protected activity.  Grenning v. Klemme, 34 F.Supp.3d 1144, 1153 (E.D. Wash. 2014).  Mere verbal harassment or abuse does not violate the Constitution and, thus, does not give rise to a claim for relief under 42 U.S.C. § 1983.  Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).  In addition, threats do not rise to the level of a constitutional violation.  Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).

To state a cognizable retaliation claim, Plaintiff must establish a nexus between the retaliatory act and the protected activity. Grenning v. Klemme, 34 F.Supp.3d 1144, 1153 (E.D. Wash. 2014).  Thus, not every allegedly adverse action will support a retaliation claim.  See, e.g., Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this' ") (citation omitted).

To prove retaliatory motive, plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind the defendant's challenged conduct.  Brodheim, 584 F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Plaintiff must provide direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is not sufficient. See McCollum v. Cal. Dep't Corr. Rehab., 647 F.3d 870, 882-83 (9th Cir. 2011); accord, Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014).  In addition to demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual. McCollum, 647 F.3d at 882 (quoting Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002)).

1          1.      Defendants Dodson and Garcia

2          Plaintiff alleges that after he expressed a desire to file a grievance for trying to threaten

3   and intimidate him to sign a false chrono, his cell was searched in retaliation by Defendants

4   Garcia and Dodson and some of his personal property was destroyed.

5          Defendants argue that the undisputed facts show that, in May 2018, neither Defendants

6   Garcia nor Dodson damaged Plaintiff's cell, and there is no evidence that they did so because

7   Plaintiff exercised his rights under the First Amendment.

8          Here, it is undisputed that on the evening of May 29, 2018, an inmate fight triggered an

9   alarm announced via institutional radio requesting correctional officers respond to the Facility A

10  Exercise Yard.  (UF 10.)  Defendant Garcia responded to the location of the fight.  (UF 11.)

11  Plaintiff was restrained in handcuffs.  (UF 12.)

12         In response to the fight, Defendant Dodson arrived on the yard while other officers were

13  in the process of escorting the involved inmates towards the Facility A Gym.  (UF 13.)  Plaintiff

14  and other inmates were escorted to holding cells located in the gym, and Defendants Garcia and

15  Dodson also proceeded to the gym.  (UF 14.)

16         Plaintiff concedes identifying inmates based on their identification card is important.  (UF

17  15.)  The inmates identified as participating in the fight were interviewed in the gym and then

18  escorted into the adjoining Facility A Program Office.  (UF 16.)  From the time Plaintiff was

19  detained after the fight to when he returned to his cell in Building 5, Plaintiff did not witness

20  Officer Dodson, Officer Garcia, or any officer enter his cell.  (UF 17.)

21         On July 3, 2018, in reply to the response in grievance log number NKSP-A-18-02588,

22  Plaintiff wrote: "E. Dodson and E. Garcia searched my cell and destroyed my personal property

23  on 5-29-2018 in retaliation of me being [i]nvolved in the alleged incident on 5-29-2018."

24  (UF 18.)

25         As an initial matter, there is no constitutionally protected right to be involved in a fight.

26  See, e.g., Garcia v. Nuno, No. 3:14-CV-00243, BAS (BGS), 2015 WL 13738291, at *13 (S.D.

27  Cal. Aug. 17, 2015) (inmate failed to state a retaliation claim because "fighting is not protected

28  conduct").  Thus, Plaintiff cannot base his retaliation claim on his alleged involvement in the

16

1   fight.

2        In his opposition, Plaintiff contends that "[o]nce [he] expressed that he would file a

3   grievance on the officers for trying to threaten and intimidate the Plaintiff into signing a 'false'

4   (chrono), the Plaintiff's living quarters were searched and destroyed damaging personal and legal

5   property.  (ECF No. 90 at 16.)

6        Defendant Dodson declares that he entered Plaintiff's cell on May 29, 2018, solely to

7   retrieve Plaintiff's identification card to confirm his identity after he was detained for potential

8   involvement in the fight.  (Dodson Decl. ¶ 6.)  Defendant Garcia declares that he never entered

9   Plaintiff's cell on May 29, 2018, and could not have destroyed any of his property.  (Garcia Decl.

10   ¶ 8.)

11        It is undisputed that Plaintiff did not witness either Defendants Dodson or Garcia enter his

12   cell on May 29, 2018.  Plaintiff concedes that identifying inmates based on their identification

13   card is important.  (UF 15.)  Notwithstanding Plaintiff's contention that Dodson and Garcia

14   searched his cell because he was alleged to be involved in the fight, Plaintiff now makes the

15   conclusory claim that at some point after the fight, he "expressed" that he would file a grievance

16   and his living quarters were searched and property was destroyed.  (ECF No. 90 at 16.)  However,

17   Plaintiff does not state to whom he "expressed" that he would file a grievance.  Thus, there is no

18   evidence that Defendants Dodson or Garcia damaged Plaintiff's cell because he expressed a

19   desire to file a grievance after the officers already responded to the fight.  Further, Plaintiff does

20   not dispute the penological purpose of needing to locate his identification card.  Accordingly, the

21   record presently before the Court does not reveal genuine issues of material fact, and summary

22   judgment should be granted in favor of Defendants Dodson and Garcia on Plaintiff's May 29,

23   2018, retaliation claim.

24        2.      Defendant Garcia

25        Plaintiff alleges that on July 23, 2018, Defendant Garcia issued a RVR in retaliation for

26   exercising his right to freedom of speech.

27        Defendant Garcia argues the undisputed facts show he submitted the report because

28   Plaintiff possessed contraband.

17

Officer Maldonado declares as follows:

On July 23, 2018, I was assigned to and working as a correctional officer in Facility A. My shift was from 6:00 a.m. to 2:00 p.m. At approximately 1:00 p.m., while I was carrying out my responsibility to conduct random searches of inmate cells I conducted a random search of cell 244 in Building 5. The cell was assigned to inmate Melvin Arrant (CDCR No. K.98602) and another inmate.  To begin my search, I conducted a clothed body search of the two inmates who occupied cell 244, and I instructed them to take a seat in the dayroom away from the cell. During my search of the cell, I located two cell phones. Because I located two cell phones in the cell, I concluded Arrant and his cellmate engaged in the rule infraction of constructive possession of a cell phone in violation of California Code of Regulations, title 15, section 3006(a).

Because my shift ended at 2:00 p.m., I was not able to personally complete and submit the prison disciplinary Rules Violation Report I issued to Arrant for possession of a cell phone that I discovered that day. Before the end of my shift, however, I wrote the circumstances of the violation memorializing the narrative regarding Arrant's possession of a cell phone.

Because I could not submit the Rules Violation Report before the end of my shift., Officer E. Garcia, who was working the next shift that began at 2:00 p.m. that day, submitted the Rules Violation Report documenting Arrant's possession of a cell phone on my behalf. Having Officer Garcia submit this Rules Violation Report on my behalf because 1 could not was to ensure the timely and prompt reporting of the rules infraction.

(Maldonado Decl. ¶¶ 2-4.)

Defendant Garcia declares, in pertinent part, as follows:

On July 23, 2018, at the beginning of my shift that began at 2:00 p.m., I was directed to submit a Rules Violation Report on behalf of Officer Maldonado, who I was informed could not submit the report himself because Officer Maldonado's shift had ended at 2:00 p.m. and he could not continue to work past that time. CDCR policy directs correctional officers to report certain inmate rule infractions using a Rules Violation Report. California Code of Regulations, title 15, section 3312(a)(3), identifies and generally outlines the Rules Violation Report process.  The Rules Violation Report is a computer-generated form with information inputted by staff. The report contains, among other information, the charged inmate's identifying information, violation date and time, circumstances regarding the misconduct, and reporting employee's name and title.

To submit the Rules Violation Report, I copied the information located on a document that Officer Maldonado prepared and that I was provided, which I understood was based on what Officer Maldonado witnessed. The document stated that, approximately one hour before the end of his shift, Officer Maldonado began his search of the cell Arrant was assigned to, and during this search, Officer Maldonado located two cell phones. The portion of the Rules Violation Report that I submitted and which is identified as "circumstances of violation" was copied from the written summary Officer Maldonado wrote on the word document I was provided.  In the "circumstances of violation" section

18

1
2
3
4

of the Rules Violation Report, I wrote an introductory sentence to indicate that I was submitting the report on behalf of Officer Maldonado—"I Officer E. Garcia am writing this report in lieu of Officer Maldonado due to him being unable to personally enter the report into SOMS."  The log number assigned to this report is 5343660.  Attached as Exhibit A is a true and correct copy of Rules Violation Report, Log No. 5343660.

5
6
7
8
9

I did not enter the cell Arrant was assigned to in Building 5 on May 29, 2018.  I did not speak with Arrant on May 29, 2018, July 23, 2018, or any other day about any grievances Arrant may have submitted against correctional officers nor any lawsuits Arrant may have filed or anticipated filing.  I submitted the July 23, 2018 Rules Violation Report, as instructed, because the officer who witnessed Arrant's rules infraction could not submit the report himself.  I have never spoke to Arrant about the July 23, 2018 Rules Violation Report I submitted or the events of that day, nor have I spoken to Arrant about the May 29, 2018 events besides my interactions with Arrant in the Facility A Program Office that day.

10

(Garcia Decl. ¶¶ 6-8.)

11

Plaintiff does not dispute that inmates are prohibited from possessing cell phones, inmate

12

possession of cell phones poses a serious risk to prison safety and security, and on July 23, 2018,

13

non-party officer Maldonado searched Plaintiff's cell and found a cell phone.  Rather, Plaintiff

14

contends that he was never given a " 'cell-search receipt from officer Maldonado indicating he

15

found 'contraband' in the Plaintiff cell."[5]  (ECF No. 90 at 16.)  Further, there is no evidence that

16

officer Maldonado improperly conducted the random search on July 23, 2018, and located two

17

contraband cell phones. In addition, Plaintiff provides no evidence to contradict the fact that

18

Defendant Garcia simply memorialized officer Maldonado's narrative documentation after the

19

random search of Plaintiff's cell on July 23, 2018.  Moreover, the mere fact that the RVR was

20

dismissed in the interest of justice does not demonstrate that it was issued with a retaliatory

21

purpose.  See Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 285-87 (1977) (holding that

22

a prisoner must establish that the protected conduct was a substantial or motivating factor for the

23

alleged retaliatory acts).  Although Plaintiff previously filed a grievance on on May 30, 2018,

24

25
26
27
28

[5] The Court notes that there is no constitutional right to be provided a cell-search receipt because a violation of Title 15, alone, does not give rise to a claim for relief.  See, e.g., Nible v. Fink, 828 Fed. Appx. 463 (9th Cir. 2020) (violations of Title 15 of the California Code of Regulations do not create private right of action); Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009) (section 1983 claims must be premised on violation of federal constitutional right); Prock v. Warden, No. 1:13-cv-01572-MJS (PC), 2013 WL 5553349, at *11–12 (E.D. Cal. Oct. 8, 2013) (noting that several district courts have found no implied private right of action under title 15 and stating that "no § 1983 claim arises for [violations of title 15] even if they occurred.")

1  "[r]etaliation is not established by showing adverse activity by the defendant after the exercise of

2  protected speech; rather, plaintiff must show a nexus between the two." See Robins v. Lamarque,

3  2011 WL 6181435 at *8 (N.D. Cal. Dec. 13, 2011) (citing Huskey v. City of San Jose, 204 F.3d

4  893, 899 (9th Cir. 2000)).  Plaintiff has not offered any evidence to support his bare statements

5  that there were no cell phones in his cell.  Thus, in light of the evidence submitted by Defendant

6  indicating the RVR was issued in response to non-party officer Maldonado finding contraband in

7  Plaintiff's constructive possession, and the absence of any evidence from Plaintiff to controvert

8  these facts, Plaintiff has failed to meet his burden of demonstrating that Defendant's action was

9  not motivated by a legitimate penological goal, i.e., the safety and security of the prison.

10  Accordingly, summary judgment should be granted in favor of Defendant Garcia.

11    **B.      Excessive Force-Florez**

12    Plaintiff alleges that on May 18, 2019, Defendant Florez used unnecessary and excessive

13  force upon him.

14    Defendant argues Plaintiff's claim fails as a matter of law because he reasonably and in

15  good faith attempted to escort Plaintiff to his housing unit.

16    When prison officials use excessive force against prisoners, they violate the inmates'

17  Eighth Amendment right to be free from cruel and unusual punishment." Clement v. Gomez, 298

18  F.3d 898, 903 (9th Cir. 2002).  In order to establish a claim for the use of excessive force in

19  violation of the Eighth Amendment, a plaintiff must establish that prison officials applied force

20  maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore

21  discipline.  Hudson v. McMillian, 503 U.S. 1, 6–7 (1992).  In making this determination, the

22  court may evaluate (1) the need for application of force, (2) the relationship between that need

23  and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and

24  (4) any efforts made to temper the severity of a forceful response.  Id. at 7, 9-10 ("The Eighth

25  Amendment's prohibition of cruel and unusual punishment necessarily excludes from

26  constitutional recognition de minimis uses of physical force, provided that the use of force is not

27  of a sort repugnant to the conscience of mankind." (internal quotation marks and citations

28  omitted)).

Excessive force cases often turn on credibility determinations, and "[the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)); see also Avina v. U.S., 681 F.3d 1127, 1130 (9th Cir. 2012) (same). Therefore, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Smith, 394 F.3d at 701 (quoting Santos, 287 F.3d at 853). The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury." Liston v. Cnty. of Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citations omitted).

In the operative complaint, Plaintiff alleges that on May 18, 2019, officers Felix and Florez appeared at Plaintiff's cage and said, "special orders from captain Chanelo you are going back to five block." Plaintiff followed officer Florez's order to cuff up. When Plaintiff placed his hands through the cage slot to be cuffed, Florez squeezed Plaintiff's fingers together on his right hand and slammed the Plaintiff's hand against the cage slot. Plaintiff felt the bone in his right hand "pop." As Plaintiff was being escorted back to building 5, officer Florez pinned Plaintiff's arm up like a wrestler. Plaintiff asked Florez why he was so rough with his escort even though Plaintiff complied with all orders. Florez did not respond and continued with the unnecessary use of force.

Defendant Florez declares as follows:

On May 18, 2019 at approximately 3:35 p.m., while on duty as a Facility A Yard Officer, Facility A Sergeant Felix directed me to escort inmate Melvin Arrant (CDCR No. K98602) from a holding cell located in the Facility A Gym to Arrant's assigned housing in Building 5 on Facility A. When I encountered Arrant, he appeared to be on edge and agitated. Arrant's tone was irritable and his voice was loud. Arrant asked why he was being taken back to Building 5. I responded by telling Arrant that I was ordered to take him back to Building 5. In response, Arrant rolled his eyes and exhaled loudly, which I perceived to be an expression to convey that he did not agree with being returned to Building 5. To prepare for the escort, I instructed Arrant to put his hands behind his back and, while Arrant was facing away from me, place his hands through the small handcuff port in the holding cell. I put Arrant in handcuffs in accordance with CDCR protocols. To my knowledge, I did not place the handcuffs unusually or overly tight on Arrant's wrists. Once the holding cell door opened and I instructed Arrant to submit to an escort, I began escorting Arrant out of the Facility A Gym towards Building 5. Sergeant Felix provided

1   coverage of the escort by walking a few feet behind Arrant and I.

2
3   The escort was a normal escort until we were more than halfway between the
    Facility A Gym and Building 5. Arrant asked me why I was being rough. I found this odd
    because I was escorting Arrant in accordance with CDCR policy and I was not being
4   rough. Arrant then stated that he was suicidal. In response to Arrant stating that he was
    suicidal, Sergeant Felix instructed me to escort Arrant back to the Facility A Gym. During
5   my escort of Arrant, I did not engage in any actions that violated CDCR policy. I did not
    use force on Arrant. I did not squeeze Arrant's fingers together or slam Arrant's hands
6   against the holding cell. I did not raise Arrant's arms behind Arrant's back while he was in
    handcuffs.
7

8   (Florez Decl. ¶¶ 3-4.)

9         Defendant argues that Plaintiff was confrontational with him, and when Plaintiff

10  expressed that Florez was being rough during the escort and that he was suicidal, Florez acted

11  pursuant to policy, stopped the escort to Building 5, and returned Plaintiff to the holding cell in

12  the Facility A gym.  Defendant further argues that Plaintiff did not suffer any physical injury as a

13  result of the escort.

14        The undisputed facts demonstrate that on May 18, 2019, Defendant Florez was instructed

15  by Felix to escort Plaintiff to Building 5, and Plaintiff followed Florez's order to cuff-up for the

16  escort.  (UF 29-30.)  However, the parties dispute what happened during the escort to Building 5,

17  including whether any force was used.

18        According to Plaintiff, Defendant Flores squeezed Plaintiff's right hand against the steel

19  cage slot of the cell to the point that Plaintiff felt his bone "pop" in his right hand.  (ECF No. 90

20  at 13.)  When Florez proceeded to escort Plaintiff to Building 5, Florez pinned Plaintiffs arms up

21  like a wrestler and Plaintiff told him he was being rough and he was in pain.  (Id.)

22        On the contrary, Defendant contends he placed Plaintiff in handcuffs in accordance with

23  CDCR protocols, and to his knowledge, he did not place the handcuffs unusually or overly tight

24  on Plaintiff's wrists. The escort was a normal escort until they were more than halfway between

25  the Facility A Gym and Building 5, and Plaintiff asked me why I was being rough, even though

26  Florez was escorting Plaintiff in accordance with CDCR policy.  (Florez Decl. ¶¶ 3-4.)  Florez

27  denies in any actions that violated CDCR policy. (Florez Decl. ¶ 4.)  Florez contends he did not

28  use force on Plaintiff and did not squeeze Plaintiff's fingers together or slam Plaintiff  hands

                                        22

against the holding cell.  (<u>Id.</u>)  Florez also denies raising Plaintiff's arms behind Plaintiff's back while he was in handcuffs.  (<u>Id.</u>)

As to the extent of the injury, Defendant argues the evidence shows that Plaintiff did not suffer any physical injury as a result of the escort, and the x-rays taken three days thereafter of Plaintiff's right hand, wrist, and shoulder did not identify any precent or recent injury to Plaintiff. "Injury and force ... are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." <u>Wilkins v. Gaddy</u>, 559 U.S. 30, 38 (2010). As the Court has noted, "[t]he absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it." <u>Hudson</u>, 503 U.S. at 7.

Here, Plaintiff contends that Florez squeezed his fingers together on his right hand and slammed the Plaintiff's hand against the cage slot, and Plaintiff felt the bone in his right hand "pop."  Plaintiff contends he complained to Florez of the tight handcuffs which was ignored. (ECF No. 1 at 21; ECF No. 90 at 13); <u>see, e.g.</u>, <u>Brooks v. Ruiz</u>, No. 2:21-cv-02010-PSG-PD, 2024 WL 2702916, at *4 (C.D. Cal. Apr. 22, 2024) ("[T]he Ninth Circuit has found a triable issue when the handcuffs caused demonstrable injury or unnecessary pain, or when officers ignored or refused requests to loosen the handcuffs once alerted that the handcuffs were too tight.") (citing, inter alia, <u>Thompson v. Lake</u>, 607 F. App'x 624, 625–26 (9th Cir. 2015) (denying qualified immunity when tight handcuffs caused plaintiff unnecessary pain and he requested police to loosen them); <u>James v. Lee</u>, 485 F. Supp. 3d 1241, 1255 (S.D. Cal. 2020) (same); <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 952, 960 (9th Cir. 2000)(tight handcuffing claim should have gone to the jury when officers refused plaintiff's request to loosen painful handcuffs); <u>Gregory v. Adams</u>, 2008 WL 486013, at *5-6 (E.D. Cal. Feb. 19, 2008) (holding that triable issue existed as to whether officer who did not personally handcuff plaintiff nonetheless used excessive force by ignoring plaintiff's repeated complaints of pain and refusing to loosen cuffs for over five hours)).

Based on the parties' conflicting declarations as to the use of force on May 18, 2019, Defendant Florez's motion for summary judgment should be denied because the Court cannot weigh the evidence or make credibility determinations.

### C.    Excessive Force and Retaliation-Tapia

Plaintiff alleges that on May 24, 2019, Defendant Tapia used unnecessary and excessive force upon him in retaliation.

Defendant argues Plaintiff's claims fails as a matter of law because he reasonably and in good faith escorted Plaintiff to his housing unit and no adverse action was taken against Plaintiff because of any protected conduct.

### a.    Excessive Force

When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment." Clement v. Gomez, 298 F.3d at 903.  In order to establish a claim for the use of excessive force in violation of the Eighth Amendment, a plaintiff must establish that prison officials applied force maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline. Hudson, 503 U.S. at 6–7.  In making this determination, the court may evaluate (1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response.  Id. at 7, 9-10 ("The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." (internal quotation marks and citations omitted)).

In the operative complaint, Plaintiff alleges that on May 24, 2019,  Defendant Tapia told Plaintiff "are you fucking stupid"  and ordered him to stand up.  Tapia snatched some legal documents Plaintiff had in his hand and threw them on the floor.  Tapia then escorted Plaintiff outside the building and once outside he pushed and threw Plaintiff against the wall.  Plaintiff felt his knee "pop."  Tapia then slammed Plaintiff to the ground and told him "fuck your rights and the Judge."  Tapia then stated, "you wanna make video complaints against my partner," and kicked Plaintiff twice in the chest.  Thereafter, Tapia dragged Plaintiff back up to his feet while he was cuffed behind his back and escorted him to the gym cages.  Once Plaintiff was back inside the gym, Tapia challenged Plaintiff to a fight.

1    Defendant Tapia declares as follows:

2
3    On May 24, 2019, I was assigned and working as a Facility A Security Patrol Officer.
     My shift was from 2:00 p.m. to 10:00 p.m. About an hour after the 4:00 p.m. inmate
     medication distribution, I responded to Building 4 to esc01t Arrant from Building 4 to the
4    Facility A Gym. When I responded to this escort, I knew Arrant had recently been
     reassigned to general population in Facility A from the mental-health unit several times
5    after he claimed he could not safely remain assigned to general population. I understood
     this to mean that ISU could not validate Arrant's safety claims. The correctional officers
6    assigned to Building 4 informed me that they needed assistance in escorting Arrant, who
     informed them that he was feeling suicidal.
7

8    Upon arriving at Building 4, I encountered Arrant in the building's dayroom area. I
     was a few feet in front of the short hallway that exited onto the exercise yard. Sergeant
9    Grimsley, the sergeant who also responded to the request to escort Arrant, instructed me
     to restrain Arrant with handcuffs and escort Arrant to the Facility A Gym where Arrant
10   could be evaluated by medical personnel based on his suicide claims. Placing Arrant in
     handcuffs complied with CDCR policy on how to safely escort an inmate, such as Arrant,
11   who claims to be suicidal. It is an effort to mitigate their ability to harm themselves or
     others. After directing Arrant to submit to handcuffs and an escort, I restrained Arrant in
12   handcuffs in compliance with CDCR training and protocols. To my knowledge, I did not
     place the handcuffs unusually or overly tight on Arrant's wrists.
13

14   After restraining Arrant in handcuffs, I escorted Arrant out of Building 4, through the
15   short hallway that exited onto the exercise yard and across the exercise yard to the Facility
     A Gym. Officer Hurley, who also responded to Building 4 in response to the request to
16   escort Arrant, assisted me by walking a few feet behind and to the side of Arrant and I.
     Arrant walked from Building 4 to the Facility A Gym with my hand placed on his forearm
17   in compliance with CDCR protocols when escorting an inmate who is restrained in
     handcuffs. I did not push or throw Arrant against any walls or onto the ground. I did not
18   trip, stomp, hit, or kick Arrant.
19

20   I escorted Arrant into the Facility A Gym, where I helped Officer Hurley place Arrant
     in a holding cell. After helping place Arrant in the holding cell, I recovered my assigned
21   handcuffs from Arrant. When I took possession of my assigned handcuffs, I walked
     towards the Facility A Gym exit, which was a few yards away from the holding cell where
22   Arrant was located. While I was walking away from the holding cell where Arrant was
     located, I heard what sounded like Arrant repeatedly strike the holding cell with his body.
23
     (Tapia Decl. ¶¶ 3-6.)
24
25   Defendant Tapia argues when he encountered Plaintiff he was angry and upset.  During

26   the escort of Plaintiff to the gym, Plaintiff was yelling and spoke over Tapia.  At the end of the

27   escort, Plaintiff was still angry and upset, and repeatedly struck the holding cell with his body.

28   Defendant properly placed Plaintiff in a holding cell to be examined by medical professionals

25

after he claimed to be suicidal.  Defendant further argues that Plaintiff did not suffer any physical

injury as result of the escort on May 24, 2019.

It is undisputed that on May 24, 2019, at around 5:00 p.m., Defendant Tapia responded to

Building 4 to escort Plaintiff to the Facility A Gym.  (UF 45.)  At that time, Defendant Tapia was

assigned to and working a shift as a Facility A Security Patrol Officer.  (UF46.)  When Defendant

Tapia responded to this escort, he knew Plaintiff had recently been reassigned to general

population from the mental-health unit several times after Plaintiff had claimed he could not

safely remain in general population.  (UF 47.)  The officers assigned to Building 4 informed

Defendant Tapia that they needed assistance in escorting Plaintiff.  (UF 50.)  The officers

assigned to Building 4 informed Sergeant Tapia that Plaintiff told them that he was suicidal.  (UF

51.)  Sergeant Tapia encountered Plaintiff in the dayroom of Building 4.  (UF 52.)  However, the

parties dispute what happened during the escort to the Facility A Gym, including whether any

force was used.

According to Plaintiff, on May 24, 2019, Defendant Tapia "ran" him into the stone

building because he made complaints.  (ECF No. 90 at 19-20.)  Plaintiff felt his right and knee

bone "pop."  (Id. at 20.)  Tapia continued to shout at Plaintiff while he slammed him to the

ground and kicked him "twice" in the chest while stating "fuck the Judge and your rights."  (Id.)

Defendant contests that during his interaction with Plaintiff on May 24, 2019, he did not

take any legal documents from Plaintiff or throw any legal documents on the ground. (Tapia Decl.

¶ 7.)  He also did not make any statement to Plaintiff regarding any prior grievances Plaintiff may

have submitted, any complaints Plaintiff  may have submitted against other correctional officers,

or any lawsuits Plaintiff may have filed or planned to file.  (Id.)  Nor did Defendant challenge

Plaintiff, and he did not use force against Plaintiff.  (Id.)

With regard to the extent of physical injury, shortly after the incident nurse Robinson

observed an abrasion to Plaintiff's right knee.  (Robinson Decl. ¶ 7.)

Based upon the foregoing, Defendant Tapia's motion for summary judgment as to the

merits of the excessive force claim should be denied because triable issues of fact exist.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.    Retaliation

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." Watison v. Carter, 668 F.3d at 1114 (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d at 567-68. To state a cognizable retaliation claim, Plaintiff must establish a nexus between the retaliatory act and the protected activity. Grenning v. Klemme, 34 F.Supp.3d at 1153.

Defendant argues that there is no evidence that adverse action was taken against Plaintiff because he engaged in a protected activity, Defendant could not have chilled any protected conduct, and escorting Plaintiff to the Facility A Gym after he claimed to be suicidal served a legitimate penological interest.

**(1)    Adverse Action**

Plaintiff claims that he was subjected to the use of excessive force by Defendant Tapia because he exercised his rights under the First Amendment to file complaints against fellow officers.  Indeed, Plaintiff alleges that prior to the use of force, Defendant Tapia told Plaintiff "are you fucking stupid"  and ordered him to stand up.  Tapia snatched some legal documents Plaintiff had in his hand and threw them on the floor.  Tapia then escorted Plaintiff outside the building and once outside he pushed and threw Plaintiff against the wall.  Plaintiff felt his knee "pop."  Tapia then slammed Plaintiff to the ground and told him "fuck your rights and the Judge."  Tapia then stated, "you wanna make video complaints against my partner."  (ECF No. 1 at 22; ECF No. 90 at 10-11, 19-20.)  The retaliatory conduct is whether force was necessary during the escort, not whether Plaintiff should have been escorted to the Facility A Gym.  Plaintiff has sufficiently described adverse action allegedly taken against him by Defendant Tapia, therefore satisfying this requirement of a retaliation claim.

///

27

1

### (2)    Chilling Effect of Future First Amendment Activities

2    Plaintiff must allege that the "official's acts would chill or silence a person of ordinary

3    firmness from future First Amendment activities." Rhodes, 408 F.3d at 568 (internal quotation

4    marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a

5    claim if he alleges he suffered some other harm," Brodheim, 584 F.3d at 1269, that is "more than

6    minimal," Rhodes, 408 F.3d at 568 n.11.

7    Contrary to Defendant's contention, as stated above, Defendant Tapia made several

8    comments prior to the use of force regarding the filing of complaints by Plaintiff and was

9    thereafter subjected to the use of excessive force.  A reasonable person in Plaintiff's position

10    would certainly be chilled from filing future complaints under these circumstances.

11

### (3)    Legitimate Penological Interest

12    Plaintiff must allege "that the prison authorities' retaliatory action did not advance

13    legitimate goals of the correctional institution...." Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.

14    1985).

15    Defendant argues that by handcuffing and escorting Plaintiff out of Building 4 to a secure

16    holding cell in the gym to be examined by medical professional served a legitimate penological

17    interest to ensure Plaintiff's safety and the safety of others.

18    However, Plaintiff's evidence shows that Defendant Tapia's retaliatory actions did not

19    advance a legitimate penological interest.  Tapia's alleged statements regarding Plaintiff's filing

20    of complaints and subsequent use of excessive force during the escort did not serve to advance a

21    legitimate penological interest.  Defendant's argument overlooks the disputed facts as to whether

22    excessive force was used on May 24, 2019, during the escort.

23    Based upon the foregoing, Defendant Tapia's motion for summary judgment as to the

24    merits of the retaliation claim should also be denied because triable issues of fact exist.

25

### D.    Qualified Immunity

26    The defense of qualified immunity protects "government officials ... from liability for civil

27    damages insofar as their conduct does not violate clearly established statutory or constitutional

28    rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. <u>Id.</u> at 205.  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such a right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that required determining a deprivation first and then deciding whether such right was clearly established, as required by Saucier). The Court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. <u>Pearson</u>, 555 U.S. at 236. The Court must view the evidence in the light most favorable to the plaintiff. <u>See</u> <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir. 2003).

Here, the Court finds Defendants Florez and Tapia are not entitled to qualified immunity. Defendants contend they are entitled to qualified immunity based on their version of the facts. However, as discussed above, the Court finds that there are genuine disputes of material facts. When analyzing Defendants' claim to qualified immunity, the Court must view the facts in the light most favorable to plaintiff. <u>Saucier</u>, 533 U.S. at 201.

When viewing the facts in the light most favorable to Plaintiff, during the escort on May 18, 2019, Defendant Florez used excessive force by squeezing Plaintiff's fingers together on his right hand and slamming Plaintiff's hand against the cage slot, and Plaintiff felt the bone in his right hand "pop."  Plaintiff contends he complained to Florez of the tight handcuffs which was ignored.  Whereas Defendant Florez denies using any force on May 18, 2019.  Plaintiff further alleges that on May 24, 2019, in retaliation for filing complaints and/or grievances Defendant Tapia "ran" him into the stone building because he made complaints.  (ECF No. 90 at 19-20.) Plaintiff felt his right and knee bone "pop."  (<u>Id.</u> at 20.)  Tapia continued to shout at Plaintiff while he slammed him to the ground and kicked him "twice" in the chest while stating "fuck the Judge and your rights."  (<u>Id.</u>)  Defendant Tapia also denies using any force on May 24, 2019.

29

Plaintiff has clearly alleged the deprivation of his actual constitutional rights, i.e., an Eighth Amendment right to be protected from excessive force by correctional staff that is not applied in a good faith effort to restore discipline, as perceived by a reasonable officer, and a First Amendment right to not be retaliated against for filing complaints and/or grievances. Accordingly, Defendants' actions, as alleged by Plaintiff, were violations of Plaintiff's Eighth and First Amendment rights and Plaintiff's rights were clearly established in 2019. See, e.g., Whitley v. Albers, 475 U.S. 312, 327 (1986) (unnecessary and wanton infliction of pain against prisoner violates Eighth Amendment); Hudson, 503 U.S. at 6-7 (1992) (prisoners have an Eighth Amendment right to be protected from the use of excessive force); Shepard v. Quillen, 840 F.3d 686, 688, 693 (9th Cir. 2016) (the Ninth Circuit has "long recognized that a correctional officer may not retaliate against a prisoner for exercising his First Amendment right to report staff misconduct" and "[a] prisoner's general right against retaliatory punishment [i]s clearly established."). The Court therefore finds that Defendants Florez and Tapia are not entitled to qualified immunity on Plaintiff's claims.

### E.    Severance of Claims

Defendants previously filed a Motion for Misjoinder of Parties and Severance of Claims (ECF No. 69), which the Court denied without prejudice after finding the motion was premature. (ECF No. 75 at 5.) The Court stated that if Defendants file a motion for summary judgment, "they may therein renew the request for severance." (Id.) In their motion for summary judgment, Defendants renew their motion to sever Plaintiff's claims. Defendants' request should be granted.

The court may also sever any claim against a party." Fed. R. Civ. P. 21. A district court has "broad discretion ... to make a decision granting severance...." Coleman v. Quaker Oats Co., 232 F.3d 1271, 1297 (9th Cir. 2000). In determining whether to sever a claim under Rule 21, the court may consider the following factors: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." Broadcom Corp. v. Sony Corp., No. 16-

30

1   1052 JVS (JCGx), 2016 WL 9108039, at *2 (C.D. Cal. Dec. 20, 2016) (citations omitted).

2          Here, as illustrated above, the two remaining excessive force claims against Defendants

3   Florez and Tapia are separate and distinct which warrants severance as Defendants would be

4   prejudiced to have to defend both claims in one trial.  Accordingly, the excessive force (and

5   retaliation) claims against Defendants Florez and Tapia should be heard in separate trials.

6                                    **IV.**

7                          **RECOMMENDATIONS**

8          Based on the foregoing, it is HEREBY RECOMMENDED that:

9      1.       Defendants' motion for summary judgment be granted in part and denied in part as

10          follows:

11          a.   Defendants Dodson and Garcia motion for summary judgment on Plaintiff's May

12               29, 2018 retaliation claim be granted;

13          b.   Defendant Garcia's motion for summary judgment on Plaintiff's retaliation claim

14               be granted; Granted as to Plaintiff's retaliation claim against Defendant Garcia

15          c.   Defendant Florez's motion for summary judgment to Plaintiff's excessive force

16               claim be denied;

17          d.   Defendant Tapia's motion for summary judgment as to Plaintiff's excessive force

18               and retaliation claims be denied;

19          e.   Defendants Florez and Tapia motion for qualified immunity be denied; and

20          f.   The excessive force (and retaliation) claims against Defendants Florez and Tapia

21               be heard in separate trials.

22          These Findings and Recommendations will be submitted to the United States District

23   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-**

24   **one (21) days** after being served with these Findings and Recommendations, the parties may file

25   written objections with the Court, limited to 15 pages in length, including exhibits.  The

26   document should be captioned "Objections to Magistrate Judge's Findings and

27   Recommendations."  The parties are advised that failure to file objections within the specified

28   time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39

31

(9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **November 25, 2024**

STANLEY A. BOONE
United States Magistrate Judge